FILED
2011 Dec-06  PM 01:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| TANECIA TURNER, | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-07-S-2331-NW |
| | ) | |
| BRUISTER & ASSOCIATES, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Tanecia Turner ("plaintiff" or "Turner") commenced this action against her former employer, defendant Bruister & Associates ("defendant" or "Bruister"), on December 26, 2007.[1]  Her complaint contained a claim for unpaid overtime pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq*. ("FLSA" or the "Act"), as well as state law claims for the torts of negligent, wanton, or intentionally wrongful hiring, training, supervision, or retention; invasion of privacy; and outrage.[2]  On February 21, 2011, Bruister moved for summary judgment on all claims.[3]  Upon consideration of the motion, briefs, and evidentiary submissions,

---

[1] Doc. no. 1 (Complaint).  The complaint also named DIRECTV, Inc. as a defendant, but DIRECTV has since been dismissed from the case.  Doc. no. 101 (Order of Dismissal as to Fewer than all Defendants).

[2] Doc. no. 1, at 7-8, 10, 12.  Plaintiff's motion to certify a class and proceed as a collective action was denied.  Doc. no. 63 (Memorandum Opinion and Order).

[3] Doc. no. 98.

the court concludes that the motion is due to be granted.

## I.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[4]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "A genuine issue of material fact 'exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party.'"  *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284-85 (11th Cir. 1997)).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman*

---

[4] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

*v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.*

*City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  "[A]n inference is not reasonable

if it is only a guess or a possibility, for such an inference is not based on the evidence,

but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692

F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is material to an issue affecting the
> outcome of the case.  The relevant rules of substantive law dictate the
> materiality of a disputed fact.  A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921); s*ee also Anderson v.*

*Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law").

## II.  BACKGROUND[5]

### A.    Turner's employment with Bruister

During the period relevant to this action, Bruister & Associates provided

---

[5] At the summary judgment stage, the court must "recount the facts in the light most favorable to . . . the non-moving party."  *Wood v. Kesler*, 323 F.3d 872, 875 n.1 (11th Cir. 2003). "For that reason, what [is] set out in this opinion as 'the facts' for summary judgment purposes may not be the actual facts."  *Id.  See also, e.g.*, *Matthews v. Crosby*, 480 F.3d 1265, 1269 (11th Cir. 2007) (same).  In construing the facts in the light most favorable to Turner, the court was required to adopt some of her testimony that contradicted other testimony she had previously given.

installation services as an independent contractor for DIRECTV, Inc, a satellite television provider.[6]  Plaintiff, Tanecia Turner, was first hired as a Customer Service Representative ("CSR") in Bruister's Florence, Alabama office in March 2005.[7]  As a CSR, Turner's job consisted primarily of answering calls from customers, faxing work orders, and inputting information into the company's computer system.[8]  Additionally, Turner had the responsibility of routing the company's technicians to different customer locations, which required her to compile the assignments the day before they were to be carried out.[9]  Turner's starting pay was $7.50 per hour.[10]

Turner was promoted to the new position of Payroll Supervisor on August 23,

---

[6] Doc. no. 97-5 (Declaration of Michael McKelvaine) ¶ 4.

[7] Doc. no. 97-1 (Nov. 30, 2010 Deposition of Tanecia Turner) ("Turner Deposition III"), at 29-31.

The record contains three depositions of Tanecia Turner.  The first was conducted on November 15, 2007, as part of an action in the Circuit Court for the Eleventh Judicial Circuit of Alabama, Lauderdale County, styled *Lopp et al. v. Bruister & Associates, et al.*, No. CV-2006-182.  Turner's attorney, Michael L. Weathers, represented the plaintiffs in that case, former coworkers of Turner's at Bruister.  Weathers conducted the first portion of that deposition, at which time the attorneys for the defendants in the *Lopp* case learned, to their apparent surprise, that Turner had on the previous afternoon retained Weathers to represent her in a lawsuit she intended to file against Bruister: *i.e.*, *this action*.  The result was a particularly long and contentious deposition, which lasted from the early afternoon until nearly ten o'clock in the evening.

Turner's second deposition was conducted on March 24, 2009, while her motion to prosecute her FLSA claims as a collective action, doc. no. 57, was pending.  Turner gave her third and final deposition on November 30, 2010.  In her third deposition, Turner testified that her first deposition, as corrected by her errata sheet, is accurate and may be relied on in this case.  Turner Deposition III, at 23-25.

[8] Doc. no. 28-1 (Nov. 15, 2007 Deposition of Tanecia Turner) ("Turner Deposition I"), at 25; doc. no. 57-1 (Mar. 24, 2009 Deposition of Tanecia Turner) ("Turner Deposition II"), at 16-17.

[9] Turner Deposition I, at 271; Turner Deposition II at 48.

[10] Turner Deposition III, at 33-34.

2005, and her pay increased to $11.50 per hour.[11]  As Payroll Supervisor, Turner was responsible for collecting timesheets from the technicians, entering the data from the timesheets into a computer program, and sending payroll information to Bruister's corporate office.[12]  For the duration of her employment with Bruister, Turner worked under the supervision of Donna Mitchell, the Site Manager for the Florence office.[13]

## B.   Turner's Unpaid Overtime Hours

Turner worked for Bruister from March 2005 until December 2005.[14]  During her employment with Bruister, she often worked in excess of forty hours per week. Turner's hours were recorded on weekly timesheets.[15]  The timesheets in the record show that she recorded more than forty working hours in sixteen of the forty-one weeks she was a Bruister employee.[16]  Turner was paid for all of those reported overtime hours.[17]  Even so, Turner testified that she worked many more overtime hours which she did not record, and for which she was not paid.

Turner worked the extra hours at the behest and urging of Mitchell, who told

---

[11] *Id.*

[12] Turner Deposition I, at 22; Turner Deposition III, at 34.

[13] Turner Deposition III, at 35.

[14] Turner Deposition I, at 28; Turner Deposition III, at 29.

[15] Turner Deposition III, at 39.

[16] *Id.* at Ex. 11 (Timesheets and Earnings Statements).

[17] *Id.* at 98.

her and other employees that Bruister's corporate office did not want them to work overtime.[18]   Turner contends that it was for that reason she worked extra hours without recording them, to "help [Mitchell] out," because excessive overtime in the Florence office was getting Mitchell in trouble with the corporate office.[19]

When she was a CSR, Turner was assigned the daily task of planning the technicians' routes for the following day.[20]  This job often took between one and three hours to complete, and Turner frequently did the routing work outside her reported hours.[21]   She testified that Mitchell was aware that she was working overtime to

---

[18] Turner Deposition II, at 20-22; *id.* at 57-58 ("She made it clear . . . that we were to write down, you know, exactly what she expected on the timesheets.  Your shift, whether you come in at whatever time, and a meal period no matter what.  That's the way she wanted the timesheets."); Turner Deposition III, at 43-45 ("Donna Mitchell . . . said that she was getting in trouble from corporate, and they were . . . cracking down on overtime.  So she was saying that we weren't really supposed to have any [overtime] but . . . the work still needed to be done.  And she was saying, you know, ['Y]ou can't put over 40 hours on your time sheet[.'] . . . Basically she just stated that we needed to put 40 hours on the time sheets, no more than that, even if we had to stay over . . . .") (bracketed alterations supplied).

Those statements in Turner's second and third depositions contradict her testimony in her first deposition, in which she stated that Mitchell never explicitly told her not to record all of her hours.  *See* Turner Deposition I, at 147 ("She didn't tell me to come in but she knew that I was coming in.  Because she, you know, made it clear that it had to be done, needed to be done.  She made me feel obligated, really."); *id.* at 148 ("Q:  Did Donna tell you, [']Tanecia, don't put those hours on your time sheet[']?  A:  No, she didn't say it like that but, I mean, she made it clear that, you know, she would appreciate me doing it and not putting it on the time sheet because of the overtime."); *id.* at 265-66 ("Q:  [D]id Donna Mitchell ever instruct you not to record the time you were allegedly helping her out?  A:  She didn't directly tell me to not write it down, no. . . .  Q:  Anyone at Bruister ever tell you that?  A:  No."); *id.* at 290 ("Q:  Did Donna ever instruct you not to write down all the hours that you worked?  A:  No.").

[19] Turner Deposition I, at 34, 146-47.

[20] Turner Deposition II, at 48.

[21] Turner Deposition I, at 269-72; Turner Deposition II, at 48-49.

complete her routing work, but not recording the additional time.[22]

While Turner was a CSR, Mitchell told her that she would be promoted to the new Payroll Supervisor position if she helped Mitchell: *i.e.*, if she did not report overtime.[23]  When she was promoted to Payroll Supervisor, Turner continued to work long hours without reporting them.  Turner stayed after hours and went into work on Sundays and other off days to "keep up" with her assignments as Payroll Supervisor.[24]  She testified that "it was a regular thing for [her] to go in when [she] was off the clock."[25]  This extra work was necessary because "[i]t was really hard to" complete her job duties during normal working hours.[26]  As both a CSR and Payroll Supervisor, Turner often worked through lunch, but recorded a lunch break anyway, so that her hours would not exceed forty per week.[27]  She also witnessed Mitchell instructing the

---

[22] Turner Deposition II, at 44-45.

[23] Turner Deposition I, at 148-50; Turner Deposition II, at 25.

[24] Turner Deposition I, at 268, 275-76.

[25] *Id.* at 276 (bracketed alterations supplied).  Turner would sometimes work off the clock multiple times per week.  *Id.*

[26] *Id.* at 277 (bracketed alteration supplied).

[27] Turner Deposition II, at 44; Turner Deposition III, at 52, 100-01.  Turner recorded lunch breaks on some days, but not on others, and could not identify the days on which she actually took the breaks. Turner Deposition III, at 107-08.  As with Mitchell's instruction not to record more than forty hours per week, Turner's testimony about the lunch breaks in the latter two depositions contradicts her testimony on the same subject in her initial deposition.  *See* Turner Deposition I, at 297-98 ("I think when I worked through lunch I wouldn't even write it down.  I . . . just . . . wrote that I worked straight through.").  In the errata sheet to her first deposition, Turner stated that she "had already testified a number of times" about not being paid for working through lunch.  Doc. 37-1, at 5-6.  However, a thorough inspection of her first deposition showed that she had in fact not testified about the topic already.

technicians to record lunch breaks on their timesheets, regardless of whether the technicians actually took lunch breaks.[28]

Turner says that she did record some of her overtime hours, because she occasionally would work so much overtime that Mitchell would give her approval to put some of those hours on her timesheets.[29]  She was paid for all of the overtime that she did report.[30]  Although Turner did not record much of her total overtime, she testified that Mitchell was aware that she was working a significant number of unreported hours, because Mitchell would sometimes come into the office on the weekends and off days when Turner was working.[31]  Turner did not raise the issue of unpaid overtime to any other Bruister employees, and testified that she did not know whether or how any member of Bruister's management, other than Mitchell, could have known of it.[32]  Turner did not keep track of the unpaid hours she worked, because Mitchell discouraged her from recording her overtime.[33]  Thus, she is unsure of how many total hours of unpaid overtime she worked.[34]

---

[28] Turner Deposition I, at 59, 282.

[29] Turner Deposition III, at 97-98.

[30] *Id.* at 95.

[31] *Id.* at 98-99.  Turner also testified that other Bruister employees were in the office during some of the off days she worked.  Turner Deposition I, at 272-74.

[32] Turner Deposition III, at 105-06.

[33] Turner Deposition I, at 266-67; Turner Deposition II, at 32, 36.

[34] Turner Deposition II, at 31-32.  In her supplemental initial disclosures, Turner stated that she was seeking damages for "40-50 hours of unpaid time."  Turner Deposition III, at Ex. 14

**C.**    **Turner's Final Day of Employment and her Great Aunt's Funeral**

At some point in December 2005, Turner's great aunt passed away.  Turner had a very close relationship with her great aunt, whom she considered to be like a second grandmother.[35]  The funeral was scheduled for December 27, 2005.[36]  A few days before the funeral, Turner asked for and received Mitchell's permission to leave work to attend the funeral.[37]  On the morning of December 27, Turner went to work at her usual time.[38]  That morning, she reminded Mitchell about her great aunt's funeral, and told her that she would have to leave work early to attend the funeral.[39]  At some point during the day, she left the office to attend the funeral.[40]  Turner carried her cellular phone, which she kept on the vibrate setting, in her purse when she entered the church where the funeral service was being held.[41]  She brought the phone with her because she wanted to be accessible should she need to be contacted regarding

_____

(Plaintiff's Supplemental Initial Disclosures), at 8.

[35] *See* Turner Deposition III, at 63, 74.

[36] *See, e.g.*, *id.* at 63.  Coincidentally, this was the same day as the incident that gave rise to the *Lopp* litigation, in which plaintiff gave her first deposition.  Because the underlying facts of the *Lopp* case are neither in evidence nor relevant to the court's analysis of this summary judgment motion, they are omitted from this opinion.  It suffices to say that the *Lopp* plaintiffs, coworkers of Turner's, accused Mitchell and other Bruister employees of tortious acts.

[37] Turner Deposition III, at 65-66.

[38] *See* doc. no. 97-4 (Deposition of Donna Mitchell), at 48.

[39] Turner Deposition III, at 71-72.

[40] *See, e.g.*, Turner Deposition I, at 28.

[41] Turner Deposition III, at 68, 115-16.

her children.[42]  During the funeral service, Mitchell placed several calls to Turner's

cellular phone.  Although the phone's ringer function was not activated, it vibrated

loudly enough in Turner's purse to be noticed by those around her in the church.[43]

As a result, Turner switched the phone from vibrate to silent after the third or fourth

call, and possibly as early as after the second.[44]  In total, Mitchell made perhaps as

many as ten phone calls to Turner during the funeral service.[45]

    After the funeral service in the church, but before the graveside ceremony and

burial, Turner checked her phone and saw that there were several missed calls from

Mitchell and multiple voice messages.[46]  Turner listened to the messages in her car

as she drove to the cemetery.[47]  In the messages, Mitchell told Turner that she had to

return to work to finish filling out a spreadsheet.[48]  Although Mitchell did not

---

[42] *Id.* at 73.

[43] *Id.* at 115 ("[P]eople were looking like, you know, ['W]hat is that noise[?' and] my mom may have said something.  I think that was the reason I put it on [silent] because she was like, ['W]hy is your phone vibrating[?'] or ['Y]ou need to shut your phone up[.']") (bracketed alterations supplied).

[44] *Id.* at 67, 116 ("Q:  Okay.  Do you recall at what point you put it on silent?  A:  I don't know.  I know the first time I didn't.  I just hit the silent button so it would stop vibrating.  But it may have been after the second time that I put it on silent.  I'm not sure.").

[45] *Id.* at 67 ("At least ten I would say, but I couldn't tell you an exact number.").

[46] *Id.* at 68-69.

[47] *Id.*

[48] Turner Deposition I, at 142; Turner Deposition III, at 69 ("I know basically she was telling me that this report was due and, you know, I needed to hurry up and get back because I needed to finish it, and things like that.").

explicitly threaten to fire Turner if she did not return, her messages suggested that Turner could possibly lose her job.[49]  Turner became nervous that Mitchell was telling people at work that Turner did not have permission to leave the office, and worried that her job could be in jeopardy unless she returned to work.[50]  Because of these fears, Turner returned to the office following the burial of her great aunt, rather than partaking in the meal that had been prepared for member's of the decedent's family.[51]

After returning to work and completing the tasks Mitchell said needed to be finished, Turner determined that she could no longer work at Bruister because she felt disrespected and underappreciated.[52]  Although Turner needed the job to support her family, she felt she could no longer continue to work under the conditions of her employment at Bruister.[53]  When she finished her work that day, she collected her belongings and did not return to Bruister.[54]  She gave no notice to Mitchell that she

---

[49] Turner Deposition I, at 142-43 ("Q:  And did she say she was going to fire you if you didn't come back?  A:  She said I could be [fired], but, no, she didn't say 'I'm going to fire you if you don't come back.'") (bracketed alteration supplied).

[50] Doc. no. 107-1 (Declaration of Tanecia Turner), at 3.  Turner's fears were apparently a result of an earlier incident, in which she told Mitchell that she had to miss work to accompany her son on a school field trip, only to learn later that Mitchell was telling others at Bruister that she had no idea where Turner was.  *Id.*

[51] Turner Deposition III, at 77.

[52] Turner Deposition I, at 17; Turner Deposition III, at 63, 65, 78-79.

[53] Declaration of Tanecia Turner, at 3.

[54] Turner Deposition I, at 349.

was quitting.[55]  After she voluntarily left her job at Bruister, the company placed an "Employee Termination Form" in her personnel file, listing "job abandonment" as the reason for the termination of her employment.[56]

Turner worked two days during her last week as a Bruister employee:  Monday, December 26 and Tuesday, December 27.[57]  Her final timesheet indicates that she worked a total of twelve hours between the two days.[58]  Turner testified that the timesheet was filled out by someone else, because it is not in her handwriting.[59]  She testified that she worked eight hours on the 27th, rather than the four listed on the timesheet, but did not otherwise dispute the content of the timesheet.[60]

[55] *Id.* at 349-51 ("Q:  Did you give any notice?  A:  No.  I mean, she should have seen all my stuff was gone.  Q:  You didn't even tell her?  A:  No.  Q:  You just took your stuff?  A:  Yes.").

[56] *Id.* at 349, at Ex. 9 (Employee Termination Form).  In her response brief, plaintiff asserts that she did not leave her employment voluntarily, essentially arguing that she was constructively fired through Mitchell's abusive management.  However, in plaintiff's first deposition, when being questioned by her own attorney, she testified that she left the company of her own volition.  *Id.* at 17 ("Q:  [W]ere you fired or did you leave voluntarily?  A:  I left voluntarily.  Q:  All right.  And would you tell us why you left voluntarily?  A:  Well, there was a number of reasons.  For one, I didn't feel appreciated . . . .") (bracketed alteration supplied).  Moreover, plaintiff is not suing for wrongful termination, but for unpaid overtime, a claim that is entirely independent of the manner in which her employment with defendant ended.

[57] Turner Deposition III, at Ex. 11, at "Bruister Production 0378" (Timesheet for week ending January 2, 2006).

[58] *Id.*

[59] Turner Deposition I, at 359-60; Turner Deposition III, at 88.

[60] Turner testified that on December 27, she was at work from 9a.m. to 7p.m., less the two hours she was at the funeral, for a total of eight hours.  Turner Deposition I, at 66, 152-53.  The timesheet shows her hours as 9a.m. to 6p.m., less a four hour "lunch" from 11:45a.m. to 3:45p.m., for a total of five hours, although the amount listed on the timesheet is four hours.  Turner Deposition III, at Ex. 11, at "Bruister Production 0378" (Timesheet for week ending January 2, 2006).

## III.  DISCUSSION

### A.     FLSA Claim

The Fair Labor Standards Act of 1938 established a scheme of minimum wages and maximum hours for certain classes of employees.  It requires that any qualifying employee be paid at a rate of one and one-half times his or her standard wage for each hour over forty worked in a given week.  29 U.S.C. § 207.  The FLSA creates a private cause of action for employees who are not properly paid for their overtime and allows plaintiffs to recover liquidated damages equal to their owed backpay if the FLSA violation was in bad faith.  29 U.S.C. § 216(b); *see also* 29 U.S.C. § 260. Plaintiff claims that over the course of her employment with defendant, she worked overtime without being compensated, and that defendant's failure to pay her was in bad faith, thereby entitling her to liquidated damages.

### 1.     Statute of Limitations

The FLSA provides a two-year statute of limitations for claims of unpaid overtime.  29 U.S.C. § 255(a).  That limitations period can be extended to three years if the plaintiff can demonstrate that the employer's violation of the FLSA was willful. *Id.*  Plaintiff filed this action on December 26, 2007.[61]  Her last day of employment

---

[61] Doc. no. 1.

with defendant was December 27, 2005.[62]   Thus, she only worked two days, December 26 and 27, 2005, within the two-year limitations period.  Consequently, she must provide evidence that defendant's alleged violations of the FLSA were willful in order to claim unpaid overtime for any hours worked on dates prior to December 26, 2005.

"To establish a willful violation [of] the FLSA, [the plaintiff] must show that the [defendant] either knew or showed a reckless disregard for the matter of whether its conduct was prohibited by the statute."  *Palmer v. Stewart County Sch. Dist.*, 178 F. App'x 999, 1005 (11th Cir. 2006) (bracketed alterations supplied) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  "Plaintiff bears the burden of proving that defendants' acts or omissions were willful."  *Mallini v. Alabama Dept. of Indus. Relations*, No. 10-0130-CG-C, 2011 WL 1897646, at *9 (S.D. Ala. May 18, 2011) (citing *Rodriguez v. Farm Stores Grocery Inc.*, 518 F.3d 1259, 1274 (11th Cir. 2008)).  Mere negligence is insufficient to extend the limitations period.  *See McLaughlin*, 486 U.S. at 134-35 (rejecting a proposed interpretation of the willfulness standard that would have "permitt[ed] a finding of willfulness to be based on nothing more than negligence").  Even so, the employer need not knowingly violate the FLSA; the three-year statute of limitations "may apply

---

[62] *See, e.g.*, Turner Deposition I, at 349.

when it simply disregarded the possibility that it might be violating the FLSA." *Allen v. Bd. of Public Educ. for Bibb County*, 495 F.3d 1306, 1324 (11th Cir. 2007). "Reckless disregard of the requirements of the Act means failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104.

"The Eleventh Circuit is hesitant to find 'willful' behavior on the part of employers, even when presented with strong evidence of an employer's violation of the FLSA." *Saxton v. Young*, 479 F. Supp. 2d 1243, 1253 (N.D. Ala. 2007) (Proctor, J.). An example of this hesitancy, cited by Judge Proctor in the *Saxton* case, is *Reich v. Department of Conservation and Natural Resources, State of Alabama*, 28 F.3d 1076 (11th Cir. 1994). *Reich* involved a claim for unpaid overtime brought on behalf of state conservation enforcement officers. The officers frequently worked more than forty hours per week during deer hunting season, but did not report and were not compensated for their overtime. *Id.* at 1079-80. Although there was evidence suggesting that the state agency should have been aware of the overtime its employees were working without pay, the Eleventh Circuit affirmed the district court's ruling that the FLSA violations were not willful, but merely negligent. *Id.* at 1084. Among the facts offered to show willfulness on the part of the conservation department were: (1) the department's official position that overtime compensation could be avoided by limiting assignments to forty hours per week, regardless of how

15

many hours were actually worked; (2) responses to anonymous employee questionnaires indicating that officers were working more than forty hours per week and falsifying their weekly reports; (3) agency officials' receipt of a report indicating unpaid overtime continued even after the institution of a policy prohibiting overtime; (4) the same report indicating a lack of control and supervision by district supervisors; (5) no discipline of any officer for violating the policy; (6) no fundamental change to the amount of work expected of each officer in a week; (7) frequent complaints about the forty-hour rule; and (8) one district supervisor telling his officers "to get their work done but not to report over 40 hours [per] week." *Id.* at 1079-81 & n.10 (bracketed alteration supplied).  Yet the *Reich* court could not "say on the basis of the record before [it] that [the defendant] showed reckless disregard for the matter of whether its conduct was prohibited."  *Id.* at 1084 (bracketed alterations supplied).

The evidence in this case, when compared with and contrasted to that in *Reich*, is insufficient to establish willfulness on the part of defendant.  Plaintiff testified that Mitchell told her and other employees that they were required to include a lunch break on their timesheets, regardless of whether they took a break or worked through lunch.[63]  She also stated that she was expected to complete all of her tasks each week,

---

[63] Turner Deposition II, at 44; Turner Deposition III, at 52, 100-01.

16

which would often require her to stay late or go into the office on weekends or other off days.[64]  Those facts form a parallel to the district supervisor in *Reich* telling his employees that they had to complete all of their work, but could report only forty hours per week, and are similar to the conservation department's policy that overtime obligations could be avoided by limiting the official workweek to forty hours.  In contrast to *Reich*, however, there is not additional evidence supporting the allegation of a willful violation.  Plaintiff never told anyone that she was not accurately reporting the time she worked,[65] unlike the employees in *Reich*, who made complaints about their uncompensated time, both openly in meetings and anonymously through questionnaires.  *Reich*, 28 F.3d at 1080.  She admitted that she does not know how anyone at Bruister, other than Mitchell, could have known of her overtime hours.[66] Perhaps most significant is the fact that plaintiff did report some overtime, and was paid for all of the overtime she reported.[67]  In contrast, the conservation department in *Reich* had a policy prohibiting overtime in *all* cases, so none was ever reported, despite the fact that officers routinely had more than forty hours' worth of work to complete, and completed all of their work.

---

[64] Turner Deposition I, at 275-77.

[65] Turner Deposition III, at 105-06.  In fact, she testified that she did not know how Bruister management could have known.  *Id.*

[66] *Id.*

[67] *Id.* at 95.

Plaintiff argues that "Mitchell and Bruister disregarded the very possibility that they were violating the FLSA[,] making the three-year statute of limitations applicable in this case."[68]  However, plaintiff identifies no evidence in support of this conclusory assertion.[69]  To the extent that Bruister can be said to have "disregarded" the possibility that it was violating the FLSA, such "disregard" is only to be expected when the employee is reporting and being paid for overtime hours:  *i.e.*, when the employer has no reason to know that unpaid overtime is occurring, because the employer *is paying* overtime.  Although plaintiff makes more specific allegations regarding what Mitchell knew and the instructions she gave, as discussed previously, those facts are not sufficient to establish a willful violation under the high standard set by *Reich*.  The facts of this case do not meet the Eleventh Circuit's standard for willfulness and, thus, the statute of limitations is not extended to three years.

### 2.    The Merits of Plaintiff's FLSA Claim

As plaintiff's claim is subject to the standard, two-year FLSA limitations period, the analysis of the merits of the claim is limited to December 26 and 27, 2005. The requirement to pay an employee a higher rate for overtime applies only when his

---

[68] Doc. no. 106 (bracketed alteration supplied).

[69] Plaintiff's response brief is filled with such statements, in which she asserts legal conclusions without citing to the record, or even summarizing the facts of the case relevant to the statement.  The court has endeavored to examine the record to find the facts supposedly underlying those statements, with varying success.

work exceeds forty hours in a given week.  *See* 29 U.S.C. § 207.  Plaintiff does not allege that she worked more than forty hours over the course of the two days within the limitations period, nor does the record support such an assertion.[70]  Therefore, there is no genuine issue of material fact as to plaintiff's claim that she was not paid for overtime hours worked, and summary judgment is due to be granted in favor of defendant on that claim.

### B.    Tort Claims

The only remaining claims are plaintiff's state law claims for negligent, wanton, or intentionally wrongful hiring, training, supervision, or retention; invasion of privacy; and outrage.[71]  In cases where the court's jurisdiction is based solely upon a federal question, the district court has discretion to entertain state claims that are supplemental to the federal claim.  *See* 28 U.S.C. § 1367(a).  The district court may decline to exercise supplemental jurisdiction when:

(1)    the claim raises a novel or complex issue of state law,

---

[70] Plaintiff states that her signature on her final timesheet was forged, and the hours listed were not in her handwriting.  Doc. no. 106, at 5.  However, this was almost certainly a result of plaintiff's decision to quit her job at the end of the day on December 27, 2005, without giving her employer any notice of her decision.  It is only logical that someone else would have to record her hours for the two days that she worked that week.  Moreover, despite her challenge to the authenticity of the handwriting on the final timesheet, plaintiff has presented no evidence suggesting she worked any longer than eight hours on December 27.  Thus, it is impossible for her to have worked forty hours during the two days she worked that week (December 26-27).

[71]*See* doc. no. 1, at 7-8, 10, 12.

19

(2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)    *the district court has dismissed all claims over which it has original jurisdiction*, or

(4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis supplied). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350 n.7 (1988).

Here, plaintiff's federal claims have been eliminated. Accordingly, this court declines supplemental jurisdiction over the remaining state law claims, and exercises its discretion to dismiss those claims.

## IV.  ORDER

Upon consideration of the foregoing issues, defendant's motion for summary judgment is GRANTED. Plaintiff's FLSA claims are DISMISSED with prejudice, and her state law tort claims are DISMISSED without prejudice. Costs incurred herein are taxed to plaintiff. The Clerk is directed to close this file.

DONE and ORDERED this 6th day of December, 2011.

_____
United States District Judge